Filed 11/10/15  P. v. A.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E062517 |
| v. | (Super.Ct.Nos. FELSS1304551 & FELJS1404496) |
| A.C., | |
| Defendant and Appellant. | OPINION |

APPEAL from the Superior Court of San Bernardino County.  Lorenzo R. Balderrama, Judge.  Affirmed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

# I

## INTRODUCTION

Appellant A.C. appeals from a trial court order revoking his outpatient placement as a mentally disordered offender (MDO) under Penal Code section 1608.[1]  Appellant contends he received ineffective assistance of counsel (IAC) by his trial attorney, who failed to prepare properly for trial by not having psychologist Meg Matty available to testify at trial.  Appellant argues Dr. Matty's testimony was relevant to establishing his baseline mental state and, had she been permitted to testify, appellant would have achieved a more favorable outcome.  We conclude there was no IAC and affirm the judgment.

# II

## FACTS AND PROCEDURAL BACKGROUND

Appellant, who is 47 years old, was convicted of assault with a deadly weapon (§ 245, subd. (a)(1)) after attacking his mother's boyfriend with a fireplace poker without provocation in 2001.  As a condition of parole, in 2004, appellant was committed to the Department of Mental Health pursuant to section 2962.  His MDO status was extended in 2008, and each year thereafter under section 2972.  In 2008, appellant was transferred to Patton State Hospital (Patton).  In October 2013, the district attorney filed a petition to extend appellant's commitment under section 2970.  After the jurors were unable to reach a unanimous verdict, the trial court declared a mistrial.

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

2

In June 2014, the San Bernardino County Department of Behavioral Health submitted a letter to the trial court stating that the San Bernardino/Riverside Conditional Release Program (CONREP) had determined that appellant could not be safely treated and supervised in an outpatient treatment program. The parties nevertheless stipulated at a status conference hearing that appellant was amenable to conditional outpatient treatment. In August 2014, appellant agreed to the terms and conditions of outpatient treatment.

On September 2, 2014, Doctors Matty and Michael Ilas, staff psychologists at Patton, wrote a Dispositional Court Report (September 2014 report) recommending the district attorney file a petition to reestablish a section 2972 civil commitment for appellant. Dr. Frederick Falvo, the medical director at Patton, also recommended the district attorney file a petition for continued involuntary treatment of appellant and extension of his commitment to 2016 under section 2970. In accordance with these recommendations, in September 2014, the district attorney filed a petition for appellant's commitment as an MDO under section 2970 (petition).

**Outpatient Commitment**

At the hearing on the petition, on October 10, 2014, appellant admitted the petition allegations. The court found appellant had a severe mental disorder that was not in remission and could not be kept in remission without treatment; because of appellant's severe mental disorder, he represented a substantial danger of physical harm to others; and appellant could be safely and effectively treated on an outpatient basis. Against the

3

recommendations of Patton and CONREP staff, the court ordered appellant placed in outpatient treatment.

Appellant arrived at a Gateways Satellite Program (Gateways) outpatient treatment facility on November 12, 2014. The next day he had his first session with his clinician, Dr. Tara Hyde. He reportedly had difficulty remaining focused and sitting still, and repeatedly approached staff, asking the same questions. However, he appeared to respond well to reassurances and repetition. At appellant's second individual session on November 17, 2014, appellant appeared open and engaged. He acknowledged and endorsed his problems with alcohol abuse. In response to being asked what his goals were while at Gateways, he stated, "'better understanding my condition,'" which he correctly identified as schizophrenia. He also stated he "'used to think that people were out to get [him]'" or did not like him.

Gateways staff reported on November 21, 2014, around 10:00 a.m., that appellant had been awake all night and repeatedly went outside to smoke, pacing around the facility, and attempting to watch TV. He was repeatedly told to return to his room and try to sleep. Appellant was noncompliant. Appellant appeared agitated and internally preoccupied, and struggled with stating his requests. Hyde evaluated appellant. Appellant told her he was concerned his medication had been replaced with Viagra. His statements were illogical and irrelevant. He was unable to respond to clear, simple questions. He stated, "'I have a cap on my head . . . It feels like a cut,'" and "'I have a hollow ear.'" Because appellant had previously experienced delusions regarding governmental agencies, his commitment terms and conditions restricted him from calling

4

governmental agencies. Appellant acknowledged having called the Coast Guard and a local hospital in the past two days. When Hyde asked him if he was worried about something, appellant responded, "'I was circumcised as a child, is that normal?'" and then immediately asked Hyde if she could help him get a job. As appellant left the session with Hyde, he was observed talking to himself.

A Gateways staff nurse reported appellant had been physically intrusive in her personal space that morning. He followed her closely despite redirection. After Hyde's session with appellant on November 21, 2014, she checked on him every 15 to 30 minutes and observed that he was internally preoccupied, speaking to himself, and having difficulty sitting still. Hyde described appellant as "floridly psychotic." It was determined he could no longer be safely and effectively treated in the community because of the intensity, severity, and unpredictability of his symptoms.

At 12:30 p.m., an ambulance arrived to transport appellant to Patton. Appellant was confused, his speech was illogical, and he was noncompliant when repeatedly told to sit on the gurney. Eventually, at 12:45 p.m., after several staff members spoke to appellant while police were called to assist, appellant voluntarily sat on the gurney and was transported to Patton. When he arrived there, he told the admitting doctor he had been drinking alcohol at Gateways. Hyde concluded appellant represented a danger to the health and safety of the community. She recommended revocation of appellant's outpatient status under section 1608, to allow for treatment during an extended stay at Patton.

5

On November 21, 2014, the community program director for MHM Services of California submitted a notification of rehospitalization, informing the court that on November 21, 2014, appellant had been rehospitalized at Patton due to "psychiatric decompensation." The notice served as CONREP's written request for revocation of appellant's outpatient status. On November 25, 2014, the community program director, Seaaira Reedy, Psy.D, filed a detailed report in support of CONREP's request for revocation of appellant's outpatient status.

**Revocation Hearing**

At the hearing on the request for revocation of outpatient status on December 5, 2014, the trial court granted the request and ordered appellant's outpatient status revoked. During the hearing, Hyde testified that during her initial meeting with appellant the day after he arrived at Gateways, he was fairly cooperative but she was nevertheless concerned about his psychiatric stability. Hyde's observations were similar during her second session with appellant on November 17, 2014. He still presented some anxiety, pressured speech, tangential speech, and rumination on issues.

When Hyde met with appellant on November 21, 2014, he was "very much psychotic." His speech was rambling and incoherent, and he was "demonstrating flight of ideas." Appellant was incapable of responding to any of her basic questions with a real response as to whether he was experiencing symptoms, feeling unsafe, or having thoughts of going off his psychotropic medications. Appellant could not provide her with any responses from which she could evaluate his level of risk. Appellant disclosed he had called the Coast Guard and a hospital within the last couple days, in violation of his

6

terms and conditions, which prohibited him from contacting governmental agencies. Appellant was unable to communicate, was responding to internal stimuli, and was uncooperative.

After speaking to the nurse, who told Hyde appellant had been intrusive, Hyde consulted with the clinical director. Rehospitalization procedures were initiated. When the ambulance arrived, appellant refused to get on the gurney and left the room. After staff talked to him for about 15 minutes, he decided to sit on the gurney and cooperate. Appellant was transported to Patton.

Hyde concluded appellant had decompensated. His appearance, presentation, and behavior had changed almost overnight. He was initially fairly logical, cooperative, and responsive to Hyde's questions and directives. Two days later he was completely incapable of responding. Hyde initiated revocation proceedings based on her review of his records and knowledge that appellant had a pattern of violent and criminal behavior when in a decompensated state. Hyde was concerned for the safety of the public and staff. Gateways' staff believed it was beyond their capacity to manage appellant at the outpatient center. Hyde believed appellant would benefit from extended treatment at the hospital. The records Hyde reviewed included the September 2014 report filed with the court and an initial MDO report.

The prosecutor objected to appellant's attorney questioning Hyde regarding the September 2014 report on relevancy grounds because decompensation can occur within a matter of days. Therefore observations of appellant in September 2014 were irrelevant to whether he decompensated in November 2014. Appellant's attorney argued the report

7

was relevant to show appellant's baseline condition and that all of the behaviors Hyde stated showed appellant's decompensated state already existed in September 2014.

The court permitted appellant's attorney to ask questions regarding the September 2014 report. In response, Hyde stated that regardless of what the September 2014 report stated, she based her opinion appellant decompensated on her observation of appellant over a period of two days in November, when his behavior changed rapidly and drastically to the point of non-manageability. Hyde acknowledged appellant's behavior when she first saw him was a concern because it was recommended he not be placed in outpatient treatment. Hyde agreed appellant was not ready at that time for outpatient treatment. However, when Hyde first met appellant in November, she was able to have a conversation with him and he was able to answer her questions. On November 21, 2014, he was no longer able to answer her questions or have a conversation with her. This was in part why Hyde concluded appellant had decompensated.

**Request for a Continuance**

Appellant's attorney requested a one-week continuance of the trial so that he could call Dr. Matty as a witness to establish appellant's baseline mental condition. The trial court denied a continuance, concluding there was enough evidence establishing appellant's baseline and Dr. Matty's testimony regarding appellant's baseline in September 2014 was not relevant to the issue of whether to revoke appellant's community outpatient treatment. The court further found appellant decompensated while at Gateways and had become unmanageable. The court concluded appellant was dangerous to himself and the community and could no longer be safely treated and

8

supervised in a community outpatient treatment facility. The court ordered appellant's outpatient status revoked under sections 1608 and 1610, and ordered that he be retained and treated at the state hospital until expiration of his commitment on April 29, 2016, subject to being extended by the district attorney filing another petition. Appellant appeals the December 5, 2014 order revoking his community outpatient status.

III

IAC

Appellant contends his trial attorney's failure to subpoena Dr. Matty to testify and have her present at the trial constitutes IAC. This deficient conduct, defendant asserts, led to the need for a continuance and the trial court's denial of the request.

To secure the reversal of a conviction based on IAC, a defendant must show (1) his counsel's performance was deficient when measured against the standard of a reasonably competent attorney, and (2) counsel's deficient performance was prejudicial because it so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. The appellate court must presume counsel's conduct fell within the wide range of reasonable professional assistance and accord great deference to counsel's tactical decisions. (*People v. Lewis* (2001) 25 Cal.4th 610, 674 (*Lewis*).)

Because it is inappropriate for a reviewing court to speculate about the tactical reasons for counsel's actions, when the reasons are not readily apparent in the record, the court will not reverse unless the record discloses no conceivable tactical purpose. (*Lewis, supra,* 25 Cal.4th at pp. 674-675.) If the record sheds no light on the reasons for

9

counsel's actions, an IAC claim is more appropriately decided in a habeas corpus proceeding. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

Appellant acknowledges in his appellate opening brief that under California Rules of Court, rule 3.1332(c), there were no valid grounds for granting a trial continuance. Appellant also concedes that the trial court could have denied a continuance based on "the lack of notice for the motion itself or the lack of any legitimate justification for a continuance." Nevertheless, appellant argues there was IAC because his attorney failed to subpoena Dr. Matty and have her available to testify at trial. Appellant assumes such conduct constituted substandard performance and the only disputed issue is whether such conduct was prejudicial.

To establish prejudice, a defendant must show a reasonable probability that, but for counsel's failings, the result of the proceeding would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 (*Strickland*).) Without a showing of prejudice, we may reject defendant's IAC claim without determining the adequacy of counsel's performance. (*People v. Brodit* (1998) 61 Cal.App.4th 1312, 1332.) A determination of prejudice requires an analysis of whether appellant suffered any prejudice from his attorney not having Dr. Matty available to testify at trial. We conclude there was no prejudice because Dr. Matty's testimony regarding appellant's mental state in September 2014 was irrelevant and cumulative. Dr. Matty's September 2014 report was part of the trial court file and Hyde testified concerning the contents of Dr. Matty's September 2014 report, which evaluated appellant's mental state at that time.

More importantly, evidence concerning appellant's mental condition in September 2014 was not relevant, and therefore it is reasonably probable that, had Dr. Matty testified, appellant would not have achieved a more favorable result. The trial court's finding that appellant decompensated to a point where he required extended inpatient treatment, thereby requiring revocation of his outpatient status, was based on evidence that appellant's behavior changed drastically after he arrived at Gateways on November 12, 2014. Although Hyde testified that appellant's mental stability was borderline when she first saw him on November 13, 2014, Hyde provided compelling testimony that appellant decompensated while at Gateways and presented a risk of danger to the public.

Citing *Turner v. Superior Court* (2003) 105 Cal.App.4th 1046 (*Turner*), appellant contends principles of collateral estoppel and res judicata require the outpatient order in October 2014 be accepted as "law of the case." Appellant asserts that revocation of outpatient status under section 1608 requires there be "material changes" in a defendant's mental condition in order for an outpatient order to be revoked. Section 1608 permits the outpatient treatment supervisor to request revocation of an outpatient order "at any time" the supervisor believes a defendant needs "extended inpatient treatment or refuses to accept further outpatient treatment and supervision."

Appellant argues that his condition on November 21, 2014, was essentially the same as his condition at the time the outpatient order was entered in October 2014. Therefore the trial court was rehearing the same issue with essentially unchanged evidence, in violation of collateral estoppel and res judicata principles. Collateral estoppel can operate to "preclude a party to prior litigation from redisputing *issues*

11

therein decided against him." (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 828.)

In *Turner*, the court held that facts involving any mental defect or dangerousness existing at the time of a prior proceeding finding the defendant not to be a sexually violent predator (SVP) cannot be relitigated. Although a defendant may become dangerous after a not-true finding due to a change in his mental health or other factors, the *Turner* court held that a jury cannot simply reach a different conclusion based on the same evidence presented to an earlier jury. *Turner* relied on principles of collateral estoppel designed to protect the individual from "the fundamental [un]fairness of a scheme that would permit the government to file successive petitions against an individual in the same forum and on the same facts" and the justice system from repetitive litigation. (*Turner, supra,* 105 Cal.App.4th at p. 1057.)

The court in *Turner* recognized that a defendant's mental health can, and often does, change. (*Turner, supra,* 105 Cal.App.4th at p. 1060.) Given that the court in the instant case was charged with assessing appellant's *current* mental condition to predict the risk of his *current* dangerousness, collateral estoppel and res judicata did not bar the court's ruling revoking appellant's outpatient commitment. The principles of collateral estoppel and res judicata do not apply here because the trial court's ruling in the instant case was not based on the same evidence before the court when it determined that appellant qualified for outpatient commitment status. Unlike in *Turner*, in the instant case the trial court appropriately relied on evidence of appellant's subsequent conduct,

after the October 2014 determination of outpatient commitment status, which demonstrated he decompensated in November 2014.

It is also not reasonably probable that Dr. Matty's testimony regarding appellant's behavior in September 2014 would have changed the trial court's findings that appellant decompensated and posed a risk of danger to the public, thereby requiring revocation of his outpatient status. As the court noted in *Turner*, "[a]lthough an individual against whom an SVP petition is filed has a strong liberty interest, this interest is outweighed by the government's significant interest in protecting the public from mentally ill persons who are likely to prey upon them. [Citations.] This interest is not diminished because of the existence of earlier proceedings that pertained to the individual's mental state and dangerousness at a different time." (*Turner, supra,* 105 Cal.App.4th at p. 1057.) This applies equally here to appellant's MDO petition. Ultimately, there was a determination based on substantial evidence that appellant's mental state deteriorated significantly after being placed in Gateways' outpatient program, such that he posed a serious and well-founded risk of danger to the public and should not remain in an outpatient placement.

Appellant has not shown there was deficient performance of counsel or prejudice. (*Strickland, supra,* 466 U.S. at pp. 694, 697.) Appellant's attorney's failure to subpoena Dr. Matty and produce her as a witness at trial does not constitute conduct deficient under prevailing professional norms, because her testimony regarding appellant's mental state in September 2014 was unnecessary and irrelevant to appellant's decompensation in November 2014. Furthermore, as discussed above, there was no prejudice in appellant's attorney not making Dr. Matty available at trial because, even if Dr. Matty were

13

permitted to testify, her testimony would have added little, if any, relevant evidence. Appellant has not demonstrated a reasonable probability that, but for counsel's failure to produce Dr. Matty as a witness, the result of the proceeding would have been more favorable to appellant. (*Id.* at p. 694.)

## IV

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


HOLLENHORST
Acting P. J.


McKINSTER
J.